NEWMEYER & DILLION LLP
JOHN A. O'HARA, CBN 122377
John.Ohara@ndlf.com
MICHAEL J. STUDENKA, CBN 204956
Michael J. Studenka@ndlf.com
C. KENDIE SCHLECHT, CBN 190978
Kendie.Schlecht@ndlf.com
SUSANNAH M. EICHELE, CBN 265190
Susannah.Eichele@ndlf.com
895 Dove Street, 5th Floor
Newport Beach, California 92660
(949) 854-7000; (949) 854-7099 (Fax)

Attorneys for Defendants and Counterclaimants
KB HOME SOUTH BAY INC., KAUFMAN AND BROAD-MONTEREY BAY, INC., and K & B BAKEWELL SEASIDE VENTURE, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA - SAN JOSE DIVISION

TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, a Connecticut corporation,

Plaintiff,

vs.

KAUFMAN & BROAD MONTEREY BAY, INC., a California corporation, K&B BAKEWELL SEASIDE VENTURE, LLC, a California Limited Liability Company, and KB HOME SOUTH BAY, INC., a California Corporation and DOES 1 through 10, inclusive,

Defendants.

AND RELATED COUNTERCLAIM.

CASE NO.: CV 13-04745 EJD (PSGx)

**DECLARATION OF JOHN O'HARA IN SUPPORT OF KB'S OPPOSITION TO TRAVELERS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

**DATE: December 5, 2014**
**TIME: 9:00 a.m.**
**CTRM: 4 (5th Floor)**

FILE DATE: October 11, 2013
TRIAL DATE SET: April 14, 2015

///

///

///

///

///



NEWMEYER & DILLION LLP

I, John. A. O'Hara , declare as follows:

1. I am an attorney at law duly licensed to practice in the State of California and am a partner with the law firm of Newmeyer & Dillion, counsel of record for Defendants and Counterclaimants KB Home South Bay Inc., Kaufman and Broad-Monterey Bay, Inc., and K & B Bakewell Seaside Venture, LLC (collectively, "KB") in the above-entitled action. Except as stated upon information and belief, I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, I could and would testify under oath competently thereto.

2. Given that KB is challenging the settlement between Travelers and the homeowners' counsel in the *Davis* Action and the dispute has not be decided this opposition briefing is filed, pursuant to Federal Rules of Civil Procedure, Rule 56(d), KB requests that the Court issue an appropriate order, including but not limited to, denying Travelers' motion for partial summary judgment, deferring ruling, or allowing KB additional time to obtain affidavits, declarations, or take discovery regarding the validity, enforceability, and propriety of Travelers' settlement with counsel for the *Davis* Action plaintiffs.

3. Attached hereto as **Exhibit 1** is a true and correct copy of pages 1 to 24 of the Written Report of Expert Testimony of Ellen R. Peck dated October 6, 2014. This report was disclosed by KB to Travelers on October 6, 2014.

4. Attached hereto as **Exhibit 2** is a true and correct copy of relevant excerpts from the rough deposition transcript of Carol Langford. I deposed Ms. Langford on November 12, 2014 and a certified copy of the deposition transcript is not yet available. I have ordered a certified copy of Ms. Langford's deposition and will bring the certified copy to the hearing of this motion.

5. Attached hereto as **Exhibit 3** is a true and correct copy of relevant excerpts from the certified deposition transcript of Mark Collinsworth who was deposed in this matter on July 14, 2014.

6. Attached hereto as **Exhibit 4** is a true and correct copy of relevant excerpts from the rough deposition transcript of Ellen Peck. Ms. Peck was deposed on November 14, 2014 and a certified copy of the deposition transcript is not yet available. I have ordered a certified copy of

NEWMEYER & DILLION LLP

Ms. Peck's deposition and will bring the certified copy to the hearing of this motion.

7. Attached hereto as **Exhibit 5** is a true and correct copy of Kaufman & Broad-Monterey Bay, Inc.'s Response to Travelers Property Casualty Company of America's Interrogatories, Set Two.

8. Attached hereto as **Exhibit 6** is a true and correct copy of pages 1 to 26 of the Report of Charles D. Henderson dated October 5, 2014. This report was disclosed by KB to Travelers on October 6, 2014.

9. To date, KB has incurred $308,594.05 in attorneys' fees and costs to Newmeyer & Dillion LLP related to this coverage action.

I declare under penalty of perjury under the laws of the United States of America and State of California that the foregoing is true and correct. Executed this 17th day of November, 2014 at Newport Beach, California.

John A. O'Hara

NEWMEYER & DILLION LLP

# EXHIBIT 1

**ELLEN R. PECK, LAWYER**
1637 EAST VALLEY PARKWAY, BOX 252
ESCONDIDO, CALIFORNIA 92027

Telephone: 760-480-2233
Fax: 866-412-1451
E-mail: pecklaw@prodigy.net

## WRITTEN REPORT OF EXPERT TESTIMONY
## (FRCP 26(a)(2)(B))

***TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, v. KAUFMAN & BROAD MONTEREY BAY, INC., a California Corporation, K&B BAKEWELL SEASIDE VENTURE, LLC, et al.,***
**United States District Court for the Northern District of California,**
**Case No.: 5:13-cv-04745 EJD-PSG**
**(re Davis)**
**October 6, 2014**

### I. INTRODUCTION

This written report of expert testimony is respectfully submitted on behalf of defendants and cross claimants KB Home South Bay Inc., Kaufman & Broad Monterey Bay, Inc., and K&B Bakewell Seaside Venture, LLC in the above entitled action.

1. **Terms.** The following terms will be used in this written report:

Defendant and Cross-Claimant KB Home South Bay Inc., Kaufman & Broad Monterey Bay, Inc., and K&B Bakewell Seaside Venture, LLC shall be referred to jointly and individually as "KB."

Plaintiffs and Cross Defendants Travelers Property Casualty Company of America, a Connecticut corporation, will be referred to as "Travelers."

The law firm of Clapp, Moroney, Bellagamba, Vucinich, Beeman & Scheley and its member, Adrienne E. Nordstrom shall be referred to as "Clapp Moroney."

The law firm of Collinsworth, Specht & Calkins shall be referred to as "Collinsworth."

Norcraft Companies, Inc. shall be referred to as "Norcraft."

*Maxion, et al. v. KB Home South Bay, Inc., et al.*, Contra Costa County Superior Court Case No. C11-00893 shall be referred to as "Maxion action."

*Aldrich, et al. v. KB Home et al.*, Monterey County Superior Court Case No. M 94490 shall be referred to as "Aldrich action."

*Collins, et al. v. KB Homes Coastal, Inc. et al.*, Riverside County Superior Court Case No. RIC 1208538 shall be referred to as "Collins action."
*Davis, et al. v. Kaufman & Broad Monterey Bay, Inc., et al.*, Monterey County Superior Court Case Number M116168 shall be referred to as "Davis action."

The California Rules of Professional Conduct are referred to as "CRPC" followed by the specific rule number.

2. **Principles guiding the preparation of this report:** This report and the opinions offered herein have been prepared consistent with the following principles:

- Unlike doctors, architects, engineers and other professions, lawyers' standards of conduct and care are defined exclusively by the law itself, including the California Rules of Professional Conduct, statutes and general principles relating to other fiduciary relationships, as interpreted by published case law. (See e.g., *Stanley v. Richmond,* 35 Cal.App.4th 1070, 1086-1087 (1995); *Mirabito v. Liccardo,* 4 Cal.App.4th 41, 45 (1992); *David Welch Co. v. Erskine & Tulley,* 203 Cal.App.3d 884, 890 (1988).)

- An expert witness may testify about the elements of duty and breach of duty. (*Stanley v. Richmond, supra,* 35 Cal.App.4th at p. 1087.) Whether an attorney has breached a professional duty is generally a question of fact (*David Welch Co. v. Erskine & Tulley, supra*, 203 Cal.App.3d at p. 890), but explaining the duty element necessarily arises within the framework of the "law of lawyers."

- In its Counterclaim, KB claims, among other claims, that Travelers has breached its duties to KB to provide a full, complete, and conflict-free defense to KB. (Docket No. 8-3, Counterclaims in this action.) KB also denies that KB wrongfully refused to be defended by Clapp Moroney since KB raised serious and substantive concerns regarding Clapp Moroney's competence, qualifications and/or conflicts of interest and that Travelers has failed and refused to address KB's concerns. (Docket No. 8, Answer, at ¶18.) For this reason, my report recites legal principles and authorities to show the bases of my opinions concerning lawyer duty and breach of duty issues, primarily in the area of conflicts of interest.

- My opinions are limited to discussions of lawyers' potential and actual conflicts of interest in support of KB's claims respecting an insurer's duty to provide appointed counsel that does not have potential or actual conflicts of interest in accepting the representation. I do not intend to opine on the duties of insurance companies or Travelers' duties to provide independent counsel pursuant to California Civil Code section 2860, although I may refer to such duties solely to give context to my opinions.

- I have cited to other California authorities relating to insurance company duties to insureds solely to demonstrate the concomitant duties of appointed counsel.

- I have assumed facts based upon my review of the materials set forth in Exhibit 1 and my understanding of the parties' positions in this matter in order to render certain opinions regarding the duties and breach of duties under California's professional obligations. Some of the points below contain citations to documents and discovery; some do not. As to any assumed fact which is disputed, it is not my intention to resolve the truth of the matter which is in the sole province of the trier of fact, as directed by this Court.

- Subject to the reservation stated in Part VII, my present opinions in this report relate solely to duties and breaches of duties respecting the Davis action. Within the Davis action, I have not been asked to render any opinions concerning the appointment of Rivera and Associates to represent KB's interests regarding Duracite, but reserve the right to opine further should this aspect of the Davis case be at issue and I am asked to opine on this issue or if I am asked to rebut the testimony of others regarding the appointment of Rivera and Associates.

## II. COMPLETE STATEMENT OF ALL EXPERT OPINIONS TO BE EXPRESSED AND THE BASIS AND REASONS THEREFOR

### A. SUMMARY OF OPINIONS

Based upon my knowledge, study, and experience concerning the professional responsibilities of lawyers under California law and my review of the documents set forth in Exhibit 1, my professional opinions are: (1) when Travelers appointed Clapp Moroney to represent KB's interests in the Davis action, Clapp Moroney had one or more actual conflicts of interest and undisclosed relationships; (2) Clapp Moroney did not make written disclosure of any conflict of interest to KB; (3) Clapp Moroney did not obtain KB's written consent to the actual and potential conflict of interest; (4) when KB called the actual conflict to Clapp Moroney's attention, Clapp Moroney still did not take steps to make a written disclosure and obtain KB's written consent or withdraw; (5) when Travelers appointed Collinsworth to represent KB in the Davis action, Collinsworth already had a conflict of interest which required the informed consent of KB prior to acceptance, arising from Collinsworth's undisclosed attorney-client relationship with Travelers by serving as monitoring counsel in the Davis action; (6) Travelers knew or should have known that it had no bases upon which to appoint either Clapp Moroney or Collinsworth as lawyers who did not have a conflict of interest in representing KB in the Davis action; (7) if Travelers delegated its duty to provide conflict-free counsel to its appointed lawyers as agents for this purpose, the appointed lawyers/agents breached their duties to provide Travelers' insureds with conflict-free counsel.

### B. THE BASIS AND REASONS FOR THE ABOVE OPINIONS

The Collins Action

1.1. Introduction to the Collins action: On or about January 7, 2013, when Travelers appointed Clapp Moroney to represent KB in the Collins action, and Clapp Moroney accepted the appointment without completing a proper conflict check, Clapp Moroney breached its duty to KB. If Clapp Moroney had completed a proper conflict check and analyzed the data consistent with California law, it would have discovered both an actual disqualifying conflict of interest and a potential conflict of interest. Both of these conflicts of interest should have been

fully disclosed in writing to KB and KB's informed written consent to Clapp Moroney's representation should have been obtained by Clapp Moroney prior to accepting the appointment. The bases and reasoning for this opinion are:

1.2. Clapp Moroney had an actual conflict of interest arising from its representation of a subcontractor directly adverse to KB on a cross-complaint in the Maxion action.

1.3. Clapp Moroney has also acknowledged a conflict in the Aldrich action matter based upon Adrienne Nordstrom's and Clapp Moroney's prior adverse representation of Norcraft against KB.

**Clapp Moroney's Actual Conflict of Interest Arising from the Maxion Action**

1.4. From about September 18, 2012 until about September 20, 2013, L. Theodore Scheley III, an attorney member of Clapp Moroney, other Clapp Moroney attorneys and Clapp Moroney served as counsel of record for American Electrical Services, Inc. ("AES") in the Maxion action, defending AES directly adverse to KB on KB's cross-complaint.

1.5. On or about January 4, 2013 when Ms. Nordstrom agreed on behalf of Clapp Moroney to serve as appointed counsel and on January 7, 2013, when Travelers notified KB that Clapp Moroney was appointed to represent KB's interests in the Collins action, Clapp Moroney was already directly adverse to and antagonistic to KB in the Maxion action.

1.6. A California attorney has two fundamental ethical duties to a client: (1) a duty of loyalty, whereby an attorney devotes his or her entire energies and (2) a duty of confidentiality, in order to promote full and open communication between client and counsel.[1]

1.7. Conflicts of interest commonly arise in one of two factual contexts: (1) in cases of successive representation, where an attorney seeks to represent a client with interests that are potentially adverse to a former client of the attorney; and (2) in cases of simultaneous representation, where an attorney represents a client in one matter and in a different, often unrelated matter or in the same matter, represents a party adverse to the first client.[2] The primary fiduciary value at stake in each of these context differs, and the applicable disqualification standards vary accordingly.

1.8. In successive representation cases, because the chief fiduciary value jeopardized is that of client confidentiality, conflicts principles and disqualification standards focus on the former client's interest in ensuring that confidentiality of matters disclosed in a prior representation will remain inviolate.[3]

---

1 *Havasu Lakeshore Investments, LLC v. Fleming*, 217 Cal.App.4th 770, 777 (2013).

2 *In re Charlisse C.*, 45 Cal.4th 145, 159-161 (2008); *Flatt v. Superior Court*, 9 Cal.4th 275, 283 (1994) ("*Flatt*").

3 *Flatt, supra, at pp. 283-284.*

1.9. However, in simultaneous representation cases, the primary value is the attorney's duty, and the client's legitimate expectation, of loyalty.[4]

1.10. California courts have long considered a conflict involving an attorney's duty of loyalty as the most egregious type of conflict and therefore the courts have developed disqualification standards[5] more stringent for simultaneous representation cases than in in successive representation cases.

1.11. California courts have explained the reasoning for this policy, as follows:

> "[a] client who learns that his or her lawyer is also representing a litigation adversary, even with respect to a matter wholly unrelated to the one for which counsel was retained, cannot long be expected to sustain the level of confidence and trust in counsel that is one of the foundations of the professional relationship. All legal technicalities aside, few if any clients would be willing to suffer the prospect of their attorney continuing to represent them under such circumstances."[6]

1.12. When a client engages the services of a lawyer, the client is entitled to feel that, until the representation is concluded, the client has the undivided loyalty of the one upon whom he looks as his advocate and his champion. "The feeling of loyalty is "'necessarily destroyed' " if the lawyer accepts representation hostile to his client's interests.

1.13. These principles apply equally when the order of simultaneous representation is reversed where, as here, Clapp Moroney was already antagonistic to KB's interests and had a continuous duty of loyalty to another client adverse to KB when it accepted appointment to represent KB in Collins. Where their purported attorney is already adverse to them, there is even less likelihood that any client, including KB, could have the level of confidence and trust in Clapp Moroney required in the attorney-client fiduciary relationship.

1.14. Mr. Scheley's and other Clapp Moroney attorneys' disqualifying conflicts of interest were imputed to all other attorneys in the Clapp Moroney firm during the time of its representation of AES in the Maxion case. [7]

---

4 *Flatt, supra,* at p. 284.

5 Without invading the province of the Court to determine whether this was a disqualifying conflict of interest, I would note that in California, disqualification in simultaneous representation cases is per se or automatic, regardless of whether the simultaneous representations have anything in common or present any risk that confidences obtained in one matter would be used in the other. (*Flatt, supra,* at p. 284.) There are a very few exceptions to the automatic disqualification which are not relevant here.

6 *Flatt, supra*, p. 285.

7 Vapnek, et al., *Cal. Practice Guide: Professional Responsibility* (The Rutter Group 2013) ¶4:32.

1.15. Clapp Moroney could not have cured the conflict by dropping AES in favor of KB in order to trigger the less onerous "substantial relationship" disqualification rule applicable to conflicts involving "former" clients.[8] Jettisoning an existing client to avoid the concurrent representation of adverse interests may itself breach counsel's duty of loyalty.[9]

1.16. The actual conflict of interest still existed even if Clapp Moroney's client's (AES's) action against KB settled during the period Clapp Moroney simultaneously represented KB in the Collins action or was dismissed. Such a settlement does not absolve the attorney of his or her ethical obligations before the dismissal or cure the actual conflict thereafter.[10]

1.17. Because the ban on concurrent representation of clients with conflicting interests (absent informed written consent) involves the attorney's duty of loyalty, instead of confidentiality, even if Clapp Moroney had implemented screening procedures or an "ethical wall", such procedures would not have cured the actual conflict of interest.[11]

1.18. Clapp Moroney never made full written disclosure to KB of its representation adverse to KB in the Maxion action, or sought its informed written consent prior to accepting representation of KB.

1.19. I have been unable to find any California authority which would provide excuse or an exception to the foregoing duties of Clapp Moroney or any other similarly situated counsel.

**Clapp Moroney's Conflicts Arising from the Aldrich Action**

1.20. On or about October 21, 2008, the Aldrich action was filed against KB Home South Bay, Inc. and Kaufman & Broad Monterey Bay, Inc. and on or about December 17, 2008, the First Amended Complaint was filed. (KB Tender of Defense in Aldrich dated April 1, 2009.)

1.21. Thereafter, KB filed a cross complaint in which it sued various subcontractors, including Norcraft. (KB Tender of Defense in Aldrich action dated April 1, 2009.)

1.22. On April 1, 2009, KB tendered its defense to Travelers as an additional insured of Norcraft. (KB Tender of Defense in Aldrich action dated April 1, 2009.)

---

8 *Truck Ins. Exchange v. Fireman's Fund Ins. Co.*, 6 Cal.App.4th 1050, 1059 (1992); Flatt, *supra*, at p. 288; *State Farm Mut. Auto. Ins. Co. v. Federal Ins. Co.*, 72 Cal.App.A4th 1422, 1431 (1999).

9 *American Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton*, 96 CA4th 1017, 1037, 1044, (2002), Pour *Le Bebe, Inc. v. Guess? Inc.*112 CA4th 810, 822–823 (2003).

10 *State Farm Mut. Auto. Ins. Co. v. Federal Ins. Co.*, supra, 72 Cal.App.4th at 1432.

11 *Concat LP v. Unilever, PLC*, supra, 350 F.Supp.2d at 821–822.

1.23. On or about September 28, 2011, Clapp Moroney and Adrienne Nordstrom associated into the Aldrich action as co-counsel of record for Norcraft (along with Norcraft's existing counsel of record, Costella).

1.24. Accordingly, for more than sixteen months (from September 28, 2011 through at least February 13, 2013) Ms. Nordstrom and Clapp Moroney represented Norcraft directly adverse to KB.

1.25. Apparently, at some time prior to January 14, 2013, Norcraft and Aldrich plaintiffs settled their disputes. (Wilhelmi Deposition, Ex. 514, p. 2.)

1.26. Thereafter, Ms. Nordstrom and Clapp Moroney finalized the settlement on behalf of Norcraft. (Wilhelmi Deposition, Ex. 514, p. 2.)

1.27. On or about January 14, 2013, Ms. Nordstrom sent a letter to Mary Kay Glaspy, Esq. (KB's counsel in Aldrich) attaching Norcraft's settlement agreement with the Aldrich plaintiffs.[12]

1.28. On or about February 13, 2013, the Court in the Aldrich action entered dismissals of Plaintiffs' Complaint and KB's cross complaint.

1.29. On or about February 21, 2013, Ms. Glaspy served Notices of Entry of Dismissal of the Complaint and Cross Complaint.

1.30. Ms. Nordstrom and Clapp Moroney never disclosed their representation of Norcraft directly adverse to KB at any time prior to February 13, 2013 or sought KB's informed written consent to the conflict.

1.31. For all of the reasons stated in paragraphs 1.6 through 1.19, absent the informed written consent of KB to the conflict of interest arising from the divided loyalty, Clapp Moroney had an actual conflict of interest which continued after the dismissal of the Aldrich action.

2. **Clapp Moroney breached its duties of loyalty and communication to KB before and after its appointment respecting conflict management.**

2.1 Before accepting representation, Clapp Moroney had a duty to conduct a conflict check to determine whether it had actual or potential conflicts of interest.[13]

---

12 Although Ms. Nordstrom now admits that the Aldrich action was a potential conflict, she now claims that she inadvertently did not disclose the potential conflict, even though she was personally working on the Aldrich action and mailed the fully executed settlement document on behalf of Norcraft one week later.

13 Cal. State Bar Form.Opn. 2011–182; see also Rest.3d Law Governing Lawyers § 121, Comment "g"—attorneys should adopt reasonable procedures to detect conflicts of interest; ABA Model Rule 5.1(a), Comment (2)—partners and law firm managers should have internal policies and procedures designed to detect and resolve conflicts of interest. See also *Hernandez v. Paicius*, 109 Cal.App.4th 452, 465, fn.8 (2003).

2.2. Ms. Nordstrom asserts that she ran a partial conflict check regarding KB before she accepted employment in the Collins action. Ms. Nordstrom has testified that she failed to notice the Maxion and Aldrich cases on the conflict list.

2.3. Ms. Nordstrom claimed that she was not able to run a complete and thorough conflict check as to all prior subcontractors represented by Clapp Moroney before appointment in the Collins action because she did not have all of the names of the subcontractors in the Collins action. Rather than meet her professional obligations and decline appointment until further information sufficient to run a conflict check could be determined, Ms. Nordstrom and Clapp Moroney, on January 4, 2013, informed Travelers that even though her firm was unable to perform the requisite conflict checks, they agreed to accept the appointment and wait to see if KB wanted to "fight about it." [14]

2.4. With full knowledge that Clapp Moroney did not know whether it had an actual or potential conflict of interest, on or about January 8, 2013, Travelers appointed Clapp Moroney to represent KB in the Collins action.[15] (Opposition, at DMF 56-59.)

2.5. While Clapp Moroney never became counsel of record in the Collins action, it did assert that it represented KB in correspondence. Travelers never withdrew the appointment and Clapp Moroney never withdrew from representation.

2.6 Clapp Moroney ran other conflict checks. However it never advised KB of (1) the actual disqualifying conflict of interest due to the Maxion action or (2) that Clapp Moroney and Ms. Nordstrom had previously represented an opposing subcontractor, Norcraft Industries, Inc., in the Aldrich action, the status of the matters, and whether Clapp Moroney had any material or substantially related confidential information which might support a potential disqualification by Norcraft. (Compare the disclosure provided by Ms. Wilhelmi in the Cha matter in June of 2013, at Witkin Decl., Ex. 2, p. 2.) These disclosures were also necessary because Clapp Moroney and Travelers had received KB's objections to appointment of Clapp Moroney, because of Clapp Moroney's history in representing subcontractors adverse to KB and whether Clapp Moroney could be loyal to KB.

### 3. The Davis Action

---

14 The foregoing acceptance of representation failed to alert Travelers that Clapp Moroney had an actual, disqualifying conflict of interest. I have no knowledge whether Clapp Moroney ever *orally* advised Travelers of its conflict arising from the Maxion action.

15 Travelers' adjuster in the Collins action noted in the claim notes that Ms. Nordstrom had indicated no conflict. It is not clear how the Travelers adjuster concluded that Clapp Moroney had no conflict when she had been told that no conflict checking regarding subcontractors had been done. Regardless of whether this is negligent, grossly negligent or intentional conduct, Travelers knew or should have known that it appointed counsel without a determination that that counsel did not have a conflict of interest.

3.1. On or about February 8, 2012, individual homeowners at Seaside Heights and the Cove at Seaside Highlands, Seaside, California filed the Davis Action against KB Home South Bay Inc., Kaufman & Broad Monterey Bay, Inc., and K&B Bakewell Seaside Venture, LLC claiming that they sustained property damages arising from defective construction of the residences in these locations.

3.2. In those projects, Norcraft was KB's subcontractor and an additional insured under a contract with Norcraft and its insurer, Travelers.

3.3. On or about July 6, 2012, KB Home South Bay Inc., Kaufman & Broad Monterey Bay, Inc., and K&B Bakewell Seaside Venture, LLC tendered the Davis action to Travelers as additional insureds under the Norcraft policies.

3.4. On or about November 7, 2012, Travelers accepted the defense of KB Home South Bay Inc., Kaufman & Broad Monterey Bay, Inc., and K&B Bakewell Seaside Venture, LLC as additional insureds subject to a full reservation of rights.

3.5. On or about May 1, 2013, the Travelers' adjuster (Pamela Colouris) assigned to the Davis case[16] requested permission to transfer the defense of KB from Glaspy & Glaspy (which had defended KB for almost a year on the Davis matter) to another law firm, which request was approved by Richard Carrillo. (Ex. 21 to Colouris Deposition.)

3.6 Also on or about May 1, 2013, the adjuster sent an email Jennifer Wilhelmi, a partner at Clapp Moroney, enclosing a copy of the Plaintiffs' complaint in the Davis case. (Ex. 505 to Wilhelmi Deposition.)

3.7. In a further email dated May 1, 2013, the adjuster advised Ms. Wilhelmi that she "would like a conflicts check on Davis v. KB Home." The adjuster further informed Ms. Wilhelmi that "This is another Norcraft claim. Glaspy's office is currently defending." (Ex. 504, Wilhelmi Deposition.)

3.8. In response to Ms. Wilhelmi's request, Conflict of Interest Reports were generated. (Ex. 506, Wilhelmi Deposition.)

3.9. Clapp Moroney's April 30, 2013 Conflict of Interest Report appears to show that Clapp Moroney represented parties other than KB, in at least seventeen matters in which both Norcraft and KB were parties, including the Aldrich and Maxion actions. (Ex. 506 to Wilhelmi Deposition.)

3.10. I am unable to determine if any other Clapp Moroney other cases involving both Norcraft and KB Home besides the Maxion and Aldrich actions were pending at the time due to the heavy redaction. (Ex. 506 to Wilhelmi Deposition.)

---

[16] Pamela Colouris, the Travelers' adjuster assigned to the Davis case will be referred to as "the adjuster" in this part of the report referring to Davis.

3.11. Clapp Moroney's May 1, 2013 Conflict of Interest Report appears to show that Clapp Moroney represented parties in at least eighty (80) matters or litigation actions involving a third party in which KB was also a party. (Ex. 506 to Wilhelmi Deposition.)

3.12. Other than the Maxion action, I am unable to determine who those parties are; whether they were adverse to KB; whether the actions were still pending at the time Clapp Moroney accepted representation of KB due to the heavy redactions by Clapp Moroney. (Ex. 506 to Wilhelmi Deposition.)

3.13. Ms. Wilhelmi responded on or about May 1, 2013 to the adjuster's request concerning conflicts:

--Even though there were three KB entities that were named defendants, Ms. Wilhelmi response was limited to "there is no conflict in our representation of Kaufman & Broad Monterey Bay, Inc."

--Ms. Wilhelmi failed to confirm that there was no conflict of interest in firm representing KB Home South Bay Inc. or K&B Bakewell Seaside Venture, LLC.

--The Clapp Moroney Conflict of Interest Report included the Maxion action as one in which both KB Home South Bay Inc. and the same Davis subcontractor, Norcraft, were parties.

--As demonstrated above, at that time, in the Maxion action, Clapp Moroney represented a subcontractor, AES, directly adverse to KB Home South Bay Inc.

--The Clapp Moroney Conflict of Interest Report also included the Aldrich action in which Clapp Moroney had represented the same subcontractor, Norcraft, against Kaufman & Broad Monterey Bay, Inc., and K&B Bakewell Seaside Venture, LLC involving the same Seaside Heights, Seaside, California development.

-- Ms. Wilhelmi did not disclose any potential or actual conflicts of interest or ask for additional time to investigate potential or actual conflicts further.

--Even though the adjuster had included the name of one subcontractor, Norcraft, Ms. Wilhelmi did not disclose any potential or actual conflicts which arose due to her firm's representation of Norcraft adverse to KB (i.e., the Aldrich action) or other third parties.

--Instead, Ms. Wilhelmi promised to run a further conflict report once Clapp Moroney received the names of other subcontractors.

3.14. On or about May 8, 2013, Ms. Wilhelmi confirmed in an email to the adjuster that she and Clapp Moroney had no conflict in representing Kaufman & Broad Monterey Bay, Inc. in the Davis action. (Ex. 509, Wilhelmi Deposition.)

3.15. At this time, Ms. Wilhelmi did not (1) confirm that her firm had no potential or actual conflicts in representing KB Home South Bay Inc. or K&B Bakewell Seaside Venture, LLC or (2) disclose any potential or actual conflicts arising due to her firm's representation of Norcraft or other third parties directly adverse to the three KB defendants in the Davis action. (Ex. 509, Wilhelmi Deposition.)

3.16. Ms. Wilhelmi agreed, on behalf of Clapp Moroney, to attempt to associate into the Davis action and represent KB's interests. (Ex. 509, Wilhelmi Deposition.)

3.17. On or about May 8, 2013, the adjuster notified KB through its counsel, Glaspy & Glaspy, Inc. that Travelers was appointing Ms. Wilhelmi and Clapp Moroney as counsel to represent the interests of KB in the Davis action. (Ex. 510, Wilhelmi Deposition.)

**Clapp Moroney's Actual and Potential Conflicts of Interest in Representing KB in the Davis Action**

3.18. As of May 8, 2013, Clapp Moroney had an actual conflict of interest in representing KB without its informed written consent due to Clapp Moroney's representation of a party adverse to KB in the Maxion action, as described above. (See ¶¶ 1.6 -1.19.)

3.19. As of May 8, 2013, Clapp Moroney also had an undisclosed potential conflict of interest arising from its representation of Norcraft adverse to KB in the Aldrich action.

3.20. CRPC 3-310(E) provides:

"A member shall not, without the informed written consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment."

3.21. **Employment adverse to Norcraft, the former client:** As of May 8, 2013, Norcraft was not yet a party to the Davis litigation.[17] This is inconsequential.[18]

--As KB's counsel, Clapp Moroney would have had a duty of loyalty to use any information in its possession which was material to the representation of KB to protect KB's interests, including any of Norcraft's confidential information from the Aldrich action which would have shifted liability from KB to Norcraft for damages and plaintiff's loss.

17 As of September 10, 2013, when KB filed its cross-complaint against Norcraft and other sub-contractors, Norcraft, predictably, became directly adverse to KB.

18 *American Airlines v. Sheppard, Mullin, Richter & Hampton*, 96 Cal.App.4th 1017, 1038-1039 (2002).

--Clapp Moroney had a conflicting duty to Norcraft to hold inviolate Norcraft's confidential information and secrets.[19]

--However, KB had invoked its direct contractual rights for indemnity against Norcraft and by tendering the defense to Travelers as Norcraft's additional insured.

Finally, it was foreseeable that Norcraft would become directly adverse to KB in the Davis action, since the general practice of home builders in construction defect litigation is to bring a cross-complaint against sub-contractors that had been involved in the residential development.

3.22. **Clapp Moroney's Possession of Norcraft's Confidential Information:** A former client need not prove that the conflicted attorney possesses confidences that could be used to the former client's disadvantage.[20]

3.23. When the former representation is "substantially related" to the current representation, a presumption that the attorney possesses confidential information arises.[21]

3.24. A conflict of interest under the current substantial relationship test requires a showing of: (1) the prior representation was direct and personal (in which case there is a conclusive presumption that the attorney acquired confidential information as a result of the representation), and (2) "evidence before the trial court supports a rational conclusion that information material to the evaluation, prosecution, settlement or accomplishment of the former representation given its factual and legal issues is also material to the evaluation prosecution or accomplishment of the current representation given its factual and legal issues."[22]

---

19 Ca. Bus. & Prof. C., ¶6068(e); CRPC 3-100(A); Ca. Evid. C., ¶¶950 et seq.

20 *Rosenfeld Constr. Co. v. Superior Court*, 235 Cal. App. 3d 566, 574 (Cal. App. 5th Dist. 1991); *H. F. Ahmanson & Co. v. Salomon Bros.*, 229 Cal. App. 3d 1445, 1452-1453 (Cal. App. 2d Dist. 1991).

21 *Id.*

22 *Farris v. Fireman's Fund Ins. Co.*, 119 Cal. App. 4th 671, 678-679 (Cal. App. 5th Dist. 2004) ("*Farris*"); *Jessen v. Hartford Casualty Ins. Co.*, 111 Cal. App. 4th 698, 709-710 (Cal. App. 5th Dist. 2003) ("*Jessen*").

An older case, *H. F. Ahmanson & Co. v. Salomon Bros.*, 229 Cal. App. 3d 1445, 1452-1453 (Cal. App. 2d Dist. 1991) articulates three factors for determining whether a substantial relationship exists between two different successive matters: (1) similarities in factual situations, (2) similarities in the legal questions posed, and (3) the nature and extent of the attorney's involvement with the former matter, including an examination of "the time spent by the attorney on the earlier cases, the type of work performed, and the attorney's possible exposure to formulation of policy or strategy." H.F. Ahmanson, 229 Cal. App. 3d at 1455.

As the *Farris* court states, "the test articulated in *Jessen* does no violence to the *Ahmanson* formula, which requires two separate inquiries in determining whether an attorney ought to be disqualified in a successive representation case—the nature of the relationship between the former representation and the current representation and the nature of the attorney's past relationship with the former client." (*Farris*, 119 Cal. App. 4th at 679.) This was confirmed when the California's Second District Appellate Court, the same court that decided *Ahmanson*, applied the *Jessen* test in *Brand* to disqualify an expert witnesses who had previously represented the party against which he was testifying. (*Brand v. 20th Century Ins. Co./21st Century Ins. Co.*, 124 Cal. App. 4th 594, 603-604 (Cal. App. 2d Dist. 2004)

3.23. With respect to the first element of the substantial relationship test:

--In the Aldrich action, I understand that Ms. Nordstrom, personally, as well as her Firm, represented Norcraft adverse to KB regarding the final terms and conditions of the settlement.

-- This would create a conclusive presumption that Ms. Nordstrom acquired Norcraft's confidential information regarding the Aldrich action.

--"[I]f the nature of the representation is such that confidences *could have* been exchanged between the lawyer and the client, courts will conclusively presume they were exchanged, and disqualification will be required."[23]

--In preparing exacting language concerning written terms and conditions of a settlement and in negotiating those terms and conditions, it is inconceivable that Ms. Nordstrom would not have had confidential communications with her client.

--In working out the exact written terms and conditions of a settlement, Ms. Nordstrom would have received Norcraft's questions and given confidential legal advice concerning those terms and conditions.

3.24. **Materiality of Norcraft's Confidential Information In Aldrich To Clapp Moroney's Representation of KB in Aldrich:** With respect to the second element of the substantial relationship test, it is respectfully submitted that the information material to the evaluation, prosecution, settlement or accomplishment of the former representation in Aldrich, given its factual and legal issues, is very material to the evaluation prosecution or accomplishment of the Davis action given its factual and legal issues.

--The Davis action involved construction defect litigation involving the construction of single-family residential properties.

--The Davis action involved the same KB entities as the Aldrich action.

--The Davis action involved the same development in Seaside Highlands in Seaside, California as did the Aldrich action.

--In the Davis action, as in the Aldrich action, the plaintiffs alleged similar construction defects to multiple single-family homes.

--In the Davis action, as in the Aldrich action, Norcraft was a subcontractor to the KB entities.

---

23 *Brand v. 20th Century Ins. Co./21st Century Ins. Co.*, 124 Cal. App. 4th 594, 602 (Cal. App. 2d Dist. 2004) [quotations omitted]; *Global Van Lines v. Superior Court*, 144 Cal. App. 3d 483, 489 (Cal. App. 4th Dist. 1983). "This is the rule by necessity, for it is not within the power of the former client to prove what is in the mind of the attorney." (*City Nat'l Bank v. Adams*, 96 Cal. App. 4th 315, 325 (Cal. App. 2d Dist. 2002).)

--In the Aldrich action, the KB entities cross-claimed against Norcraft and in Davis, it was likely that the KB entities would cross-claim against Norcraft.

--In the Aldrich action, the master agreements between Norcraft and the KB entities were substantially similar or the same as in the Davis action.

--The Davis and Aldrich actions involved overlapping indemnity contracts and Travelers' insurance policies between the KB entities and Norcraft.

--The Davis and Aldrich actions involved Norcraft's same scope of work.

--The Davis and Aldrich actions involved overlapping legal principles, including duty of care issues arising from professional services rendered in connection with construction projects; negligent engineering; negligent supervision, negligent construction management; construction defect litigation liability; principal-agent responsibility; contract interpretation; scope of work; and negligence issues.

3.25. Accordingly, the factual issues and the legal principles necessary for the evaluation, settlement and accomplishment of Clapp Moroney's representation in Aldrich was directly material and relevant to Clapp Moroney's evaluation, defense, settlement and accomplishment of the representation and necessary for the benefit of KB.[24]

3.26. Clapp Moroney had fiduciary duties to protect Norcraft's confidential information obtained in the substantially related Aldrich action. Clapp Moroney had potentially conflicting duties to use any material information in its possession for the benefit of KB's interests against Norcraft. The actual use or misuse of confidential information is not determinative; it is the possibility of the breach of confidence which controls. Thus, Clapp Moroney had a potential conflict of interest pursuant to CRPC 3-310(E) and the duty of loyalty discussed above[25] and were required to obtain the informed written consent of KB before accepting or continuing the representation.

3.27. On or about May 13, 2013, L. Theodore Scheley, III, as Clapp Moroney's Managing Partner, acknowledged receipt of the file and the representation of KB in the Davis case to Travelers' adjuster, Ms. Colouris. (Ex. 512, Wilhelmi Deposition.)

3.28. Mr. Scheley was counsel of record for AES, directly adverse to KB in the Maxion action. Nevertheless, Mr. Scheley accepted representation of KB on behalf of the firm without disclosing to Ms. Colouris or KB the actual conflict of interest that he or his firm had.

3.29. Between May 8, 2013 and June 19, 2013, Clapp Moroney and Ms. Wilhelmi failed to make disclosures concerning the Maxion action actual conflict, the potential conflict in the Aldrich action and failed to obtain KB's informed written consent to the conflicted representation consistent with California professional obligations and CRPC 3-310(E).

---

24 *Morrison Knudsen Corp. v. Hancock, Rothert & Bunshoft, LLP*, 69 Cal.App.4th 223, 234-236 (1999)
25 *American Airlines v. Sheppard, Mullin, Richter & Hampton*, 96 Cal.App.4th 1017, 1040-1042 (2002).

3.30. On June 5, 2013, Gene Witkin, KB's coverage counsel objected to the appointment of Ms. Wilhelmi and Clapp Moroney in the Davis and Cha actions for a variety of reasons, including that he wanted to determine that they were qualified, competent and conflict-free. In order to determine this issue, Mr. Witkin requested that Travelers provide the results of any conflict checks performed for this matter. (Ex. 515, Wilhelmi Deposition.)

3.31. Ms. Colouris did not respond to this request or request that Ms. Wilhelmi provide Mr. Witkin with the conflict checks performed prior to Clapp Moroney's acceptance of representation of KB in the Davis action. She left it to Ms. Wilhelmi and Mr. Witkin to resolve amongst themselves. (Colouris Deposition.)

3.32. KB's coverage counsel, Gene Witkin, discovered the Maxion conflict. On or about June 5, 2013, Mr. Witkin directed a letter to Clapp Moroney and Ms. Wilhelmi, wherein he called the Maxion action conflict of interest to their attention. He requested further information about the Maxion as well as other conflicts. (Ex. 514, Wilhelmi Deposition.)

3.33. In a letter dated June 19, 2013, addressed to Mr. Witkin, Clapp Moroney, through Ms. Wilhelmi, denied that there was any actual or potential conflict of interest arising from the Maxion action and represented:

> "With regard to your reference to the Maxion, et al. v. KB Home South Bay, Inc., et al. Ted Scheley of our office was retained to represent American Electrical Services, Inc. in the Maxion matter. The claims were resolved via settlement in March 2013 and the Application for Good Faith Settlement has been approved by the court. American Electrical Services, Inc. is not involved as a cross-defendant in the Cha, et al. v. KB Home Coastal, Inc."[26] (Ex. Witkin Decl., Ex. 2, p. 3, ¶1.)

3.34. Moreover, as Ms. Wilhelmi and Clapp Moroney knew or should know, the fact that neither a settlement nor inactivity in a case where counsel is counsel of record affect the actual conflict of interest in representing another client in unrelated litigation directly adverse to a current client. [27]

3.35. Clapp Moroney, through Ms. Wilhelmi made the following disclosure of Ms. Nordstrom' and Clapp Moroney's representation of Norcraft against KB in the Aldrich action.

> "Aldrich, et al. v. Kaufman & Broad Monterey, et al. – Adrienne E. Nordstrom of our office was retained to represent Norcraft Companies, Inc. in the Aldrich matter. Prior to Ms. Nordstrom's retention, a settlement had been negotiated between

---

[26] Clapp Moroney, in asserting that it was appointed counsel for KB had fiduciary duties of honesty and candor to KB. (Ca. Bus.& Prof.C., §6106.) Yet, its June 19, 2013 disclosure was less than candid and did not comply with CRPC 3-310(A)(1). Clapp Moroney did not disclose that it was still counsel of record adverse to KB in the Maxion action since its client, AES, had not been dismissed from the action.

[27] *State Mut. Auto. Ins. Co. v. Federal Ins. Co*, 72 Cal.App.4th 1422, 1431-1432 (1999) –settlement of one matter after acceptance of second case adverse to a current client does not affect automatic disqualification; *Metro Goldwyn Mayer v. Tracinda Corp.*, *State Mut. Auto. Ins. Co. v. Federal Ins. Co*, 36 Cal.App.4th 1832, 1841(1995) –irrelevant that other action in which Firm represented adverse party was long dormant.

Plaintiffs and Norcraft Companies through Norcraft Companies, Inc.'s prior counsel of record. Ms. Nordstrom finalized the previously negotiated settlement. The file is closed."

3.36. Despite the potential conflict of interest which required written disclosure and informed written consent of KB under CRPC 3-310(E), Ms. Wilhelmi's purported disclosure was inadequate and not in compliance with CRPC 3-310(E) and (A).

3.37. CRPC 3-310(A) provides:

(A) For purposes of this rule: (1) "Disclosure" means informing the client or former client of the relevant circumstances and of the actual and reasonably foreseeable adverse consequences to the client or former client;

3.38. Ms. Wilhelmi's and Clapp Moroney's statement did not disclose the relevant circumstances required by CRPC 3-310(A) including but not limited to: (1) the date that Clapp Moroney commenced representation of Norcraft; (2) the length of the representation; (3) when the representation terminated; (4) that the Aldrich action involved the same Seaside Highlands development as did the claims in Davis; (5) that the Aldrich claims were substantially similar to the Davis claims; (6) whether it possessed material confidential information relating to Norcraft; and (7) any other relevant circumstances. These facts were necessary to evaluate whether there was still a conflict; whether Clapp Moroney could provide undivided loyalty to KB or would have competing duties to Norcraft and whether Clapp Moroney might be subject to disqualification or withdraw if Norcraft objected to the representation.

3.39. Clapp Moroney's June 19, 2013 statement failed to advise KB of the actual and foreseeable adverse consequences to KB in the Davis action by reason of its prior representation of Norcraft in the substantially related Aldrich action adverse to KB, including but not limited to (1) whether Clapp Moroney would have residual duties of loyalty and confidentiality to Norcraft which would materially limit or compromise Clapp Moroney's ability to discharge its fiduciary duties to KB; (2) whether it would be ethically able to prosecute a cross-complaint against Norcraft; and (3) the likelihood that Clapp Moroney might be subject to disqualification or withdrawal, thus disrupting KB's ability to proceed with the Davis action.

3.40. If Clapp Moroney was unable to make these and other disclosures because of a duty to Norcraft or Travelers, then it could not comply with CRPC 3-310(A)(1) and (E) and should not accept or continue representation of KB.

3.41. In a letter dated June 26, 2013, Mr. Witkin notified Ms. Wilhelmi and Clapp Moroney that he could find no record of dismissal of AES from the Maxion action, and requested further information. Mr. Witkin also requested that Ms. Wilhelmi confirm whether Clapp Moroney had refused Travelers' instructions to associate in as counsel in the Davis action. (Ex. 517, Wilhelmi Deposition.)

3.42. In a letter dated July 25, 2013, after almost a month to research or consult with counsel concerning the relevant conflicts of interest authorities relevant to the actual conflict of interest in the Maxion action, Ms. Wilhelmi stated:

"With regard to your reference to the Maxion, et al. v. KB Home South Bay, Inc., et al. matter, it is my understanding that the settlement funds and signatures of American Electrical Services, Inc. were delivered to counsel for KB Home South Bar, Inc. pursuant to the terms of the Settlement Agreement. However, at this time counsel for KB Home South Bay, Inc. has not filed the Request for Dismissal as to American Electrical Services, Inc." (Ex. 518, Wilhelmi Deposition.)

3.43. As noted above, the settlement or dormancy of the case was irrelevant to Clapp Moroney's actual conflict of interest arising from the Maxion action. (See ¶3.34 and fn. 27 above.)

3.44. Even though Clapp Moroney had an actual conflict arising from the Maxion action and a potential conflict arising from its former representation of Norcraft in the Aldrich action and even though Clapp Moroney had not obtained the necessary informed written consent of KB in order to comply with CRPC 3-310(A) and (E), Ms. Wilhelmi confirmed that she and her firm were still available to associate into the Davis action to represent the interests of KB. (Ex. 518, Wilhelmi Deposition.)

3.45. By letter dated August 13, 2013, Mr. Witkin again advised Clapp Moroney that it was still adverse to KB in the Maxion action which had not yet been dismissed and therefore had a conflict. (Ex. 519, Wilhelmi Deposition.)

3.46. Clapp Moroney still did not withdraw from appointment and still did not attempt to obtain the informed written consent of KB.

3.47. Whether from negligence, gross neglect, reckless disregard of its obligations to KB respecting conflict of interest, Clapp Moroney engaged in a pattern and practice in four other cases of failing to adhere to its professional obligations to KB respecting (1) full and accurate disclosure of the relevant circumstances and of the actual and reasonably foreseeable adverse consequences to KB or (2) obtaining KB's informed written consent to its service as appointed counsel for KB. These four other cases are: (1) the Collins Action; (2) *Cha v. KB Home Coastal, Inc.*, Orange County Superior Court Case No. 30-2012-00606699-CU-CD-CXC; (3) *Chong, et al. v. KB Home Coastal, Inc., et al.*, which was presented as a notice of claim of defects pursuant to California Civil Code sections 895 et seq. and is still proceeding through the statutory pre-litigation process; and (4) *Peter Aldawood et al., v. KB Home North Bay, Inc. et al.*, Stanislas County Superior Court Case No. 673190.

3.48. Neither Ms. Wilhelmi nor Clapp Moroney forwarded the correspondence between Mr. Witkin and Ms. Wilhelmi regarding conflicts of interest to Travelers. Ms. Wilhelmi's failure to forward this information to Travelers was a breach of her duty to Travelers to communicate material information regarding the Davis action and a violation of Travelers policy requiring outside counsel to notify Travelers of all potential and actual conflicts of interest.[28]

[28] Ca. Bus. & Prof. C.,§6068(m)(duty to keep client informed of significant developments); CRPC 3-500(A)(same communication duty); Travelers' Retention and Billing Policy for Outside Counsel, p. 3,section 5 (conflicts of interest)

3.49. After KB filed a cross-complaint against a number of subcontractors, including Norcraft on or about September 10, 2013 (Ex. 521, Wilhelmi Deposition), Ms. Wilhelmi did not immediately conduct another conflict check as she had promised Travelers she would on or about May 1, 2013.

3.50. Sometime after November 25, 2013 and before February 21, 2014, Ms. Wilhelmi's assistant reviewed the Monterey County Superior Court records in the Davis action to determine which subcontractors were parties in that action. Ms. Wilhelmi did not specifically recall whether AES and Norcraft were named as subcontractors in the cross-complaint. However, she obtained the names to conduct a further conflict check. (Wilhelmi Deposition, pp. 289-300, 303.)

3.51. Ms. Wilhelmi did not disclose to KB any potential or actual conflicts of interest arising from the filing of the cross-complaint in the Davis action, including disclosure of the potential or actual conflicts of interest arising from the circumstance that Norcraft was now directly adverse to KB.

3.52. On February 21, 2014, claiming an unwaiveable conflict of interest due to confidences acquired by Ms. Nordstrom from former client DH Smith, which was a cross-defendant in KB's cross-complaint in the Davis action,[29] Ms. Wilhelmi and Clapp Moroney notified Travelers, but not KB, that Clapp Moroney must withdraw.[30] (Exhibits 522-524, Wilhelmi Deposition.)

**4. After Travelers Appointed Collinsworth as Tripartite Counsel for KB in the Davis Action, Collinsworth Developed Conflicts of Interest by Serving as Travelers' Monitoring Counsel in the Davis Action**

4.1. On or about February 25, 2014, Travelers' adjuster, Ms. Colouris, requested, via email, that Mr. Calkins and Collinsworth conduct a conflict check in the Davis action. (Ex. 14, Calkins Deposition.)

4.2. On or about February 26, 2014, Mr. Calkins advised Ms. Colouris that Collinsworth did not find any conflicts in the Davis action, beyond the fact that "KB has not allowed us to associate in to any case due to the pending coverage issues between Travelers and KB." (Ex. 14, Calkins Deposition.)

---

and p. 1 [any waiver from this Policy must be in writing and signed by Travelers].

29 Even though the Aldrich action presented the identical potential conflict as the D.H. Smith conflict, Clapp Moroney did not give KB notice of this potential conflict or withdraw.

30 Coincidentally, in early February 2014, Travelers' lawyers in *Fidelity & Guaranty Insurance Company, et al., v. KB Home Coastal, Inc., et al.*, United States District Court for the Central District of California, Case No. EDCV 13-946 JAK (DTBx) were in email correspondence with Ms. Nordstrom, prepared a draft declaration for her review and execution, adverse to KB's claims. On February 26, 2014, just five days after Clapp Moroney's withdrawal from appointment in the Davis action, Ms. Nordstrom's declaration was filed.

4.3. Ms. Colouris then advised Collinsworth that Travelers was retaining the firm to provide Travelers' additional insured, KB, with a defense in the Davis action. (Ex. 14 and Ex. 15, Calkins Deposition.)

4.4. On or about April 1, 2014, Travelers advised Glaspy & Glaspy that, effective February 26, 2014, it had appointed Collinsworth to represent KB's interests in the Davis action. (Ex. 17, Calkins Deposition.)

4.5. Prior to its appointment in the Davis action, Collinsworth had served as Travelers' monitoring counsel in construction defect litigation when KB had not permitted Collinsworth to associate in as appointed tripartite counsel as an additional insured on a Travelers policy of insurance. Collinsworth was paid for its services as monitoring counsel. (Collinsworth Deposition.)

4.6. Collinsworth did not make any written or oral disclosure to KB of its role as Travelers' monitoring counsel, prior to accepting Travelers' appointment as tripartite counsel for KB in the Davis action. (Collinsworth deposition.)

4.7. CRPC 3-310(B)(1) provides:

> "A member shall not accept or continue representation of a client without providing written disclosure to the client where:
>
> (1) The member has a legal, business, financial, professional, or personal relationship with a party or witness in the same matter; . . ."

4.8. Under the tripartite relationship, even though Travelers was not a named party to the Davis action, it was deemed to be a real party at interest in the Davis action, and a joint client with KB of Collinsworth.

4.9. Accordingly, because of the prior legal, business and professional relationship with Travelers and because Travelers was a real party of interest in the Davis action, Collinsworth had a duty to make a written disclosure to KB pursuant to CRPC 3-310(A)(1) prior to accepting or continuing the tripartite representation of KB.

4.10. CRPC 3-310(B)(3) provides:

> "A member shall not accept or continue representation of a client without providing written disclosure to the client where:
>
> . . . . . . . . . . . . . . . . . . . . . .
>
> (3) The member has or had a legal, business, financial, professional, or personal relationship with another person or entity the member knows or reasonably should know would be affected substantially by resolution of the matter;. . ."

4.11. Travelers' interests concerning indemnity and defense obligations of its insureds and KB as an additional insured, would be affected substantially by resolution of the Davis action. Because of its prior legal, business and professional relationship with Travelers as

monitoring counsel, Collinsworth had a duty under CRPC 3-310(B)(3) to make a written disclosure to KB pursuant to CRPC 3-310(A)(1) prior to accepting or continuing the tripartite representation of KB.

4.11. When KB did not agree that Collinsworth could associate in as counsel of record in the Davis action, Collinsworth then took on the role of monitoring counsel for Travelers in the Davis action. As monitoring counsel, Collingsworth:

--Prepared an initial status report dated March 24, 2014 regarding the Davis action. (Ex. 16, Calkins Deposition.) This was not sent to KB.

--Prepared a proposed budget for the proposed representation. (Ex. 1 at Budget (3/11/2014), Calkins Deposition.) This was not sent to KB.

--On May 20, 2014, a Collinsworth attorney traveled from Southern California to Monterey, California to appear for Travelers and attend a Case Management Conference in the Davis action at the Monterey Superior Court. (Ex. 20, June 10, 2014 invoice, entries for May 20, 2014, Calkins Deposition.)

--Collinsworth submitted at least two invoices to be paid for its legal services rendered to Travelers. (Ex. 19 and Ex. 20, Calkins Deposition.) These were not sent to KB.

4.12. By reason of its retention by Travelers, its performance of legal services to Travelers; its submission of its invoices to Travelers and Travelers payment of Collinsworth's billings for legal services in the Davis action, Collingsworth formed an individual attorney-client relationship with Travelers in the Davis action as monitoring counsel. In this situation, the expectation is that Collinsworth owes its fidelity to Travelers not KB.[31]

4.13. As in all situations of representation of two or more parties in the same matter, counsel appointed in a tripartite relationship to represent both the interests of the insured and the insurer, must be able to discharge undivided loyalty to both clients without favoring one or the other. The favoring of the interests of one client over another create circumstances involving potential and actual conflicts of interest requiring the informed written consent of all clients pursuant to CRPC 3-310(C)(1) and (2).

4.14. In the Davis action, Travelers and KB already had disputes and divergent interests respecting the appointment of conflict-free counsel and control of KB's defense.

4.15. After KB's denial of authority to appear in the Davis action as tripartite counsel, Collinsworth immediately served as Travelers' monitoring counsel and demonstrated that Collinsworth was willing to favor the interests of Travelers, including monitoring KB's activities and transmitting information only to Travelers.

31 *Morrison Knudsen Corp. v. Hancock, Rothert & Bunshoft, LLP*, 69 Cal.App.4th 223, 233-234 (1999).

4.16. Collingsworth's' actions created questions about its ability to have undivided loyalty to KB while jointly representing KB and Travelers, which created potential or actual conflicts of interest pursuant to CRPC 3-310(C)(1) and (2) requiring KB's informed written consent.

5. For all of the foregoing reasons, KB's rejection of seriously conflicted and ethically challenged appointed counsel in the Davis matter, was not only reasonable, but justified.

6. **Travelers' Conduct in Appointing Counsel That Were Not Conflict-Free**

6.1. Travelers has a written policy requiring all appointed counsel to undertake a thorough search for actual or potential conflicts of interest prior to appointment by Travelers and to report all potential and actual conflicts to Travelers at the outset of the engagement or thereafter.

6.2. Any waiver from this policy must be in writing and signed by Travelers.

6.3. On January 4, 2013, in the Collins action, Ms. Nordstrom informed Travelers' adjuster that even though her firm was unable to perform the requisite conflict checks, Clapp Moroney agreed to accept the appointment and wait to see if KB wanted to "fight about it."[32]

6.4. With full knowledge that Clapp Moroney did not know whether it had an actual or potential conflict of interest and had not complied with Travelers' conflict policy, on or about January 8, 2013, Travelers' adjuster appointed Clapp Moroney to represent KB in the Collins action.[33]

6.5. Also in the Collins case, on March 1, 2013, Ms. Nordstrom and Clapp Moroney advised the same adjuster that Clapp Moroney still had not determined whether it was conflict free or not:

> "We are ok on KB cases in Southern California, we just need more information on the Northern California cases because there is a slightly higher possibility for a conflict."

6.6. The Travelers adjuster did nothing to implement Travelers' conflict policy.

6.7. Notwithstanding that Ms. Nordstrom and Clapp Moroney had been appointed as counsel for KB and Travelers, thus owing her putative client a duty of loyalty, Ms.

---

32 The foregoing acceptance of representation failed to alert Travelers that Clapp Moroney had an actual, disqualifying conflict of interest. I have no knowledge whether Clapp Moroney ever *orally* advised Travelers of its conflict arising from the Maxion action.

33 Travelers' adjuster in the Collins action translated an inability of Clapp Moroney to conduct a conflicts check to a statement in the claim notes that Ms. Nordstrom had indicated no conflict. This was not true.

Nordstrom took a position against KB and favoring Travelers regarding the appointment of counsel issue. In that March 1, 2014 email, Ms. Nordstrom opined to the Travelers adjuster:

> "On Collins, it doesn't seem to matter which firm it is, KB is going to object to whatever firm Travelers wants to retain. It does not appear to be a conflict issue. Attorney Olsen advised that 'there are a lot of other issues and discussion going on between KB and Travelers.'"

6.8. Thus, in the foregoing exchanges, the Travelers adjuster appointed and continued appointment of counsel that had failed to adhere to Travelers' conflict policies and exhibited behavior adverse to KB.

6.9. In the Collins action, at a time when Clapp Moroney was still under appointment to represent the interests of KB and owed KB a duty of undivided loyalty, Travelers' individual counsel interfered with that duty.

6.10. In or about early February, 2014, before Clapp Moroney withdrew from its appointment in the Davis action, Travelers' individual counsel persuaded Ms. Nordstrom to testify against her firm's putative client, KB.

6.11. Travelers' individual counsel prepared a draft declaration for Ms. Nordstrom's signature to use against KB.

6.12. In Ms. Nordstrom's declaration dated February 26, 2014, in the Collins action, she represented under oath:

> "My office conducted a conflicts check prior to accepting referral of the defense of KB Home. My office has no conflicts with KB Home." (Nordstrom Decl., 2:17-18, ¶6.)

6.13. This statement fails to disclose other information which is necessary to make the statements true:

> -- First, the statement omits the information (a) that the conflicts check was incomplete because Ms. Nordstrom did not have the information about subcontractors which were involved in order to determine whether Clapp Moroney had a conflict or not; (b) that at the time Clapp Moroney offered to accept the appointment as appointed counsel for KB in the Collins action, it did not know if it had a conflict of interest or not; (c) that Clapp Moroney advised the Travelers adjuster that it had not run a conflict check regarding subcontractors (with whom KB was likely to be adverse); and (d) that Travelers appointed Clapp Moroney to represent KB when Clapp Moroney had not cleared conflicts.
>
> -- Second, the statement omits the information that from the time of appointment until September 20, 2013, Clapp Moroney had an actual conflict of interest due to its representation of another party directly adverse to KB in the Maxion action, to which it had never disclosed or obtained informed written consent.

--Third, the declaration failed to disclose that Clapp Moroney had a potential conflict of interest in both the Collins action and the Davis action arising from Ms. Nordstrom's representation of Norcraft in the Aldrich action.

-- Fourth, the declaration fails to disclose whether Clapp Moroney ran a current conflict of interest check in order to state that Clapp Moroney has no present conflicts of interest.

-- Fifth, whether Clapp Moroney had no conflicts on or about February 26, 2014, was irrelevant to the issue of whether Clapp Moroney had had conflicts of interest when appointed to represent KB and since Clapp Moroney no longer represented KB.

-- Sixth, Ms. Nordstrom collaborated with Travelers' counsel in preparing a declaration, and was paid by Travelers to prepare the declaration. This declaration was used in support of Travelers' Motion for Partial Summary Judgment to obtain relief harmful to the interests of KB. This collaboration and direct representation of Travelers by Ms. Nordstrom against the interests of KB violated her ethical duties to her prospective client, KB, by favoring Travelers and giving testimony adverse to KB.

6.14. In the Davis action:

--The Travelers adjuster appointed Clapp Moroney to serve as tripartite counsel notwithstanding the ambiguous and incomplete response to the adjuster's conflict inquiry.

--The Travelers adjuster ignored KB's complaints about Clapp Moroney's conflicts of interests.

--After the KB filed a cross-complaint, the Travelers adjuster failed to require Clapp Moroney to conduct another conflict of interest search regarding the sub-contractor cross defendants.

6.15. In the Davis action, when KB did not authorize Collinsworth to appear as counsel of record, following Travelers' appointment, Travelers compromised Collinsworth's potential to act with undivided loyalty to KB by retaining and paying Collinsworth to serve as monitoring counsel.

## II. DATA AND OTHER INFORMATION CONSIDERED BY THE WITNESS IN FORMING THE OPINIONS.

See Exhibit 1 hereto.

## III. ANY EXHIBITS TO BE USED AS A SUMMARY OF OR SUPPORT FOR THE OPINIONS

At this point, none are contemplated.

## IV. THE QUALIFICATIONS OF THE WITNESS INCLUDING A LIST OF ALL PUBLICATIONS AUTHORED BY THE WITNESS WITHIN THE PRECEDING TEN YEARS

See Exhibit 2 hereto.

## V. THE COMPENSATION TO BE PAID FOR THE STUDY AND TESTIMONY

I charge $500.00 per hour for all of the time in studying, consulting, preparing a report and giving testimony in the instant case. I am not "paid" for my testimony, but rather I am paid for the time that it takes to formulate and articulate my opinions and to appear in a proceeding to give expert testimony.

## VI. A LISTING OF ANY OTHER CASES IN WHICH THE WITNESS HAS TESTIFIED AS AN EXPERT AT TRIAL OR BY DEPOSITION WITHIN THE PRECEDING FOUR YEARS

See Exhibit 3 hereto.

## VII. RIGHT TO SUPPLEMENT

I reserve the right to supplement and/or amend the opinions expressed herein in response to positions taken and testimony given by Travelers' experts, to amplify what is stated above, where necessary, and especially in view of information and testimony not presently known to me or new information presented by Travelers' experts as a result of ongoing discovery prior to, or at trial, and to supplement this report should additional information be brought to my attention during the course of this proceeding.

Date: October 6, 2014

Respectfully submitted,

Ellen R. Peck

Ellen R. Peck

# EXHIBIT 2

ROUGH DRAFT DISCLAIMER

LORRIE L. MARCHANT
CERTIFIED SHORTHAND REPORTER, CSR No. 10523
RPR, CRR, CCRR, CLR, RMR

DEPOSITION OF: CAROL M. LANGFORD

DATE: 11/12/2014

---

It is understood by all attorneys and/or their staff using, saving onto a hard computer disk, or receiving a Livenote/Realtime ASCII or e-mailed rough draft transcript that:

1. The following is an unedited rough draft transcript. Various corrections and/or changes may be made before the final version is complete. The use of this rough draft transcript is limited by C.C.P. 2025.540(b). This reporter, as well as any affiliated court reporting agency, will not be responsible for any variance of this draft from the final transcript.

2. Because of the nature of stenographic outlines, differences WILL exist between the Livenote/Realtime rough draft copy and the certified transcript prepared by the reporter. Those differences will include the following, among others:

a. Words may change;
b. Page and line numbers may change;
c. Punctuation may change; and/or
d. Quotes may change.

3. Providing a Livenote/Realtime ASCII and/or e-mail or saving Livenote/Realtime onto a computer hard drive will only be provided when a certified copy is purchased and there will be a charge for the Livenote/Realtime rough transcript in addition to the charge for the certified copy.

***ACCEPTANCE OF THIS REALTIME DRAFT***

***IS AN AUTOMATIC FINAL COPY ORDER.***

UNCERTIFIED ROUGH DRAFT

Q. Right now you're asking looking for all the the KB entities that were implicated in the Maxion?
A. Okay. Let me get Maxion again. Where is Maxion? I cannot find my complaint in Maxion, my copy of it. I know I asked for and it received -- Oh, here it is. Maxion. Okay.
Q. What are the KB entities that are implicated to your understanding in the Maxion action?
A. Home South Bay, KB one. KB one. That's it.
Q. Any others?
A. I see condition homes South Bay, the California corporation, KB one Virginia corporation and Does 1 through 1000.
Q. Okay. Now, and KB entities are involved in the Davis action?
A. In Davis. KB Monterey Bay, KB Bakewell, Seaside venture. KB Homes South Bay. The Bakewell company in Monterey, the Bakewell company and Does 1 through 1000.
Q. So would you agree with me that KB Homes South Bay is a party in both the Maxion action and the Davis action?
A. Yes.

UNCERTIFIED ROUGH DRAFT

Q. Okay. So now we have a situation where Clapp importance is representing American electrical services and they're diverse to condition homes South Bay in the Maxion action?
A. Yes.
Q. Would you agree with that?
A. Yes, I do.
Q. And that's an ongoing case and hasn't been concluded or dismissed; correct?
A. Right.
Q. Before it's been concluded or dismissed they're asked to represent KB Home in the Davis action, isn't that correct?
A. Yes.
Q. And they can't do that under California law, can they? You would have to agree with that, wouldn't you?
A. I think that would be problematic.
Q. Right. Because that's an actual disqualifying interest because you're representing a party American electrical services adverse to KB in one case and then in Davis you would be representing KB and you can't do that in California, can you?
A. You can. If it's waived or if it's so different -- I mean, it would have to be -- the

cases would have to be very, very different.
Q. Okay. You can do it if you provide a full disclosure to the clients and obtain a knowing and intelligent waiver; isn't that correct?
A. Yes.
Q. Is there any evidence that Clapp Moroney provided a full disclosure to KB and provided a knowing and intelligent waiver from KB?
A. No. But my understanding is they weren't asked to defend KB South Bay. They were only asked to defend KB Monterey so they could do that. My -- I didn't --
Q. Wait a minute.
A. I didn't think -- oh, they were counsel of record for KB for State Farm. But that was in the Maxion case.
Q. Wait a minute. Wait a minute. You just made a statement that you believe that Clapp Mahoney was not -- was only going to be helping one KB entity in the Davis matter?
A. I thought it was only KB Monterey.
Q. What's the basis for that statement?
A. My conversations with Lindsee and Angela.
Q. Who was going to represent the other KB entities?

A. I don't know. It could be anyone that Travelers or whoever wants to appoint.

Q. So you're -- your testimony is that Lindsee Falcone or Angela Martin told you that Clapp Moroney was only appointed by Travelers to represent one entity, one KB entity in the Davis action and not to represent other KB entities?

A. I understand that they were only asked to represent KB Monterey.

Q. And that's based on what?

A. My conversations with them.

Q. And so you believe because they were only asked to represent one entity that they did not have an actual disqualifying conflict?

A. That's right. KB moments ray and KB South Bay are separate, as far as we know.

Q. And did you perform any analysis regarding the Aldridge matter and potential -- actual or potential conflicts that the Clapp more than a firm may have had as a result of that matter?

A. Not particularly, no. I just know that they represented -- when you're saying that I'm not sure what you're asking, but if you're asking about the conflicts check I don't know. I just know that they represented Norcraft versus KB Monterey and

# EXHIBIT 3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE BRANCH

TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA, a Connecticut corporation,

Plaintiff,

vs.

KAUFMAN & BROAD MONTEREY BAY, INC., a California Corporation, K&B BAKEWELL SEASIDE VENTURE, LLC, a California Limited Liability Company, and KB HOME SOUTH BAY, INC., a California Corporation, and DOES 1 through 10, inclusive,

Defendants.

Case No.: CV 13-04745 EJD (PSGx)

VIDEOTAPED DEPOSITION OF MARK T. COLLINSWORTH

Newport Beach, California

Monday, July 14, 2014

Reported by:
CATHY A. WOOD, RPR, RMR, CRR
CSR No. 2825

Job No. 8275

Pages 1 - 150

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE BRANCH

TRAVELERS PROPERTY CASUALTY )
COMPANY OF AMERICA, a )
Connecticut corporation, )
)
Plaintiff, )
)
vs. ) Case No.: CV 13-04745 EJD
) (PSGx)
KAUFMAN & BROAD MONTEREY )
BAY, INC., a California )
Corporation, K&B BAKEWELL )
SEASIDE VENTURE, LLC, a )
California Limited Liability)
Company, and KB HOME SOUTH )
BAY, INC., a California )
Corporation, and DOES 1 )
through 10, inclusive, )
)
Defendants. )
)

VIDEOTAPED DEPOSITION of MARK T. COLLINSWORTH, taken on behalf of Defendants, at Newmeyer & Dillion, LLP, 895 Dove Street, Fifth Floor, Newport Beach, California 92660, beginning at 2:33 p.m. and ending at 6:10 p.m. on Monday, July 14, 2014, before CATHY A. WOOD, RPR, RMR, CRR, Certified Shorthand Reporter No. 2825.

APPEARANCES:

For Plaintiff:

THE AGUILERA LAW GROUP
BY: ADAM WRIGHT
Attorney at Law
700 South Flower Street
Suite 3350
Los Angeles, California 90017
(213) 929-1330
awright@aguileragroup.com

For Defendants:

NEWMEYER & DILLION LLP
BY: JOHN O'HARA
Attorney at Law
895 Dove Street
Fifth Floor
Newport Beach, California 92660
(949)854-7000
john.ohara@ndlf.com

For the Witness:

NOON & ASSOCIATES APC
BY: TIMOTHY S. NOON
Attorney at Law
501 West Broadway
Suite 1260
San Diego, California 92101
(619) 235-6200
tnoon@noonlaw.com

The Videographer: Gary Wade

carrier, uh, undertake its responsibilities pursuant to our client's status as an additional insured. 02:43
BY MR. O'HARA:
Q Do you agree that in order to satisfy a duty to defend, an additional insurer must provide the builder with a full, complete, immediate and conflict-free defense? 02:43
MR. NOON: Objection. Vague, ambiguous, overbroad. Uh, go ahead and answer generally.
THE WITNESS: Uh, I think there's cases out there that would say that, yes. 02:43
BY MR. O'HARA:
Q Are you familiar with the Davis versus KB Home matter?
A Yes. 02:44
Q And what is the Davis versus KB Home matter?
A As I understand it, it's a case approximately 30, 32 single-family homes in Seaside, California, up in Monterey County, uh, brought by the Milstein firm against KB Home and, uh, for construction defects. I believe they may have alleged causes of action that included violation of Civil Code 896, uh, perhaps tort claims and warranty claims as well. 02:44
Q Have you personally been involved in, uh, providing legal services related to the Davis versus KB 02:44

Home case? 02:44

A It's -- you know, that's a little bit of a gray area. I would say that I have been involved, we -- we have received an assignment from Travelers, uh, we sent a letter to I believe it was your office -- no, I think 02:44 it was Glaspy's office on this, indicating our retention to represent KB. I don't think we ever received authority, uh, to associate in on behalf of KB. We have looked at the pleadings, monitored the court docket, uh, and just tried to be prepared to -- to defend when and 02:45 if, uh, KB ever authorized us to do so.

Q Have you or your firm incurred any fees performing the legal services in the Davis matter that you just mentioned?

A Yeah, I think in the two invoices that we've 02:45 talked about previously.

Q Do you know approximately how much you've billed for the legal services you performed?

A Off the top of my head, I don't know. It's probably a very small number. 02:45

Q Do you have any estimate for me?

MR. NOON: Don't guess.

THE WITNESS: Yeah. I would tell you it's probably under 40 hours.

///

BY MR. O'HARA: 02:45
Q And have you sent bills for the legal -- those legal services to Travelers?
A Yes.
Q Have you been paid for the bills you sent to Travelers with respect to the Davis matter? 02:46
A I don't know that information.
Q Do you expect to be paid for the bills you've sent to Travelers?
A Yes. 02:46
Q If you haven't been paid yet, it's not because they're refusing to pay, it's just it hasn't been processed?
A Yeah, I'm not sure. I think the invoices that you'll get, uh, one is for, uh -- it might be dated May 02:46 and one might be dated in June, so I just don't know the if they've paid those yet.
Q Have you sent any bills to KB Home for legal services related to the Davis matter?
A No. 02:46
Q Will you be sending any bills to KB Home for legal services related to the Davis matter?
A No.
Q Do you believe that KB Home has any obligation to pay any of your legal bills related to the Davis 02:47

matter? 02:47
MR. NOON: Objection. Calls for speculation, overbroad. Outside the scope of his retention.
THE WITNESS: You know, in my mind, uh, no, KB does not, but that's probably what you guys are fighting 02:47 about.
BY MR. O'HARA:
Q What is your understanding of what is required to form an attorney-client relationship?
MR. NOON: Objection. Vague, ambiguous, 02:47 overbroad, calls for opinion testimony. Uh, I'm not gonna allow him to just give general overbroad statements about legal opinions. If you want to ask him about something in this context, uh, that's fine, but I'm not gonna have him just answer some overbroad 02:47 question like that.
MR. O'HARA: To that, you're instructing him not to answer that question?
MR. NOON: Yes.
BY MR. O'HARA: 02:48
Q And you're following the instruction?
A I am.
Q Would you agree that when a client agrees to engage a lawyer to perform legal services for an agreed-upon cost, that that forms an attorney-client 02:48

MR. NOON: Objection. Calls for speculation. Way outside the scope of his representation. Do not speculate. 02:52

MR. WRIGHT: Join. Lacks foundation. Argumentative. 02:52

MR. NOON: Also calls for legal opinion.

THE WITNESS: Not knowing, uh, the basis of any of their claims, I don't know that I can really comment without speculating.

BY MR. O'HARA: 02:52

Q Has your firm been proposed as counsel -- strike that.

Has your firm been appointed as counsel for KB Home in other construction defect matters besides the Davis matter? 02:52

A We --

MR. NOON: Objection. Vague. Go ahead.

THE WITNESS: We have received assignments from Travelers on other matters for KB, uh, with similar results in that we notified counsel for KB of our retention and have not been authorized to represent KB in any of those cases. 02:53

BY MR. O'HARA:

Q But you use the word "assignments," I think, sometimes. Travelers uses the word "appointment," so 02:53

I'll use the word "assignment" just when we're talking about this. 02:53

A Sure.

Q Is that all right?

A Yes. 02:53

Q Okay. Do you have an estimate for me of how many times you received assignments from Travelers to represent KB Home in construction defect matters?

A Maybe somewhere between 30 and 35.

Q And has KB Home allowed your firm to, uh, 02:53
represent it in any of those 30 or 35 matters?

A No.

Q In those 30 to 35 matters, has your firm also incurred fees for legal services and billed Travelers for those fees for legal services? 02:54

MR. NOON: Objection. Overbroad. You can answer generally.

THE WITNESS: You know, I can't say sitting here for sure yes, but I would assume yes.

BY MR. O'HARA: 02:54

Q So let's take -- let's take this case just as an exemplar case because it's the one we're here on.

A This case being Davis?

Q This case being Davis.

Travelers assigned you to represent KB, 02:54

correct? 02:55
A Yes.
Q KB would not allow you to represent it, correct?
A Yeah. And -- and just to be specific on -- in 02:55 answering that so I'm not misleading you, I don't -- I don't know specifically if Travelers expressly communicated to us their, uh, unwillingness or if we received a response from the Glaspy firm saying, We'll discuss it with KB and get back to you and they never 02:55 got back to us, so I don't know which way it was on this one.
MR. NOON: I might have misheard you, but I think you just said Travelers. Stand by one second.
MR. O'HARA: I think he did, but I got the gist 02:55 of it.
MR. NOON: Yeah, you testified, "I don't know if Travelers expressly communicated to their unwillingness." Can you correct that testimony?
BY MR. O'HARA: 02:55
Q Instead of Travelers, you actually meant KB?
A Correct. I don't know one way or another whether the Glaspy firm responded affirmatively that KB did not want us to represent them or if they just never responded. 02:56

Q Okay. So just to clarify that, you got information either directly from KB or from KB's chosen defense counsel that you were not -- your firm was not going to be allowed to represent KB in the Davis matter; correct? 02:56 02:56
A Well, I think that's what I was trying to say. I don't know if they specifically communicated to us that we're not going to allow you in or if it was one of -- a situation where they said let's -- we'll talk to our client KB and get back to you and we never heard a response. 02:56
Q And did you assume based on the lack of response that you were not gonna be allowed to represent KB?
A That's my assumption just based upon a number of other cases. 02:56
Q So the work that you did in -- your firm did in the Davis matter that you've billed to Travelers, was that work being performed for Travelers?
MR. NOON: Objection. Misstates the evidence. 02:57
THE WITNESS: No, I think -- I think our work was being performed as a firm retained to represent KB Home. Uh, it included reviewing the pleadings, uh, figuring out what the status of the case was and monitoring the court docket, such that if KB were to 02:57

contact us and say, uh, we're willing to accept you as our counsel pursuant to Travelers' acceptance of an AI defense obligation, we would be prepared to start getting up to speed as quickly as possible. 02:57

BY MR. O'HARA: 02:57

Q Did you have an attorney-client relationship with Travelers at the time you performed the work in Davis that you have billed Travelers for?

MR. NOON: Objection. May call for expert testimony, but go ahead and answer. 02:58

THE WITNESS: I don't believe we have an attorney-client relationship with Travelers in that respect. I think we're retained to represent KB Home, not to represent Travelers. And as we discussed earlier about the tripartite relationship, without the 02:58 relationship with KB, I'm not sure that tripartite exists.

BY MR. O'HARA:

Q That's what I'm getting at, if -- if the tripartite relationship never formed, but there was some 02:58 attorney-client relationship that did form, didn't that -- isn't it true that that attorney-client relationship had to be between your firm and Travelers only?

MR. NOON: Objection. Misstates his testimony. 02:58

He's not gonna answer that. That's not what he's testimony had to. He's testified there was not relationship formed between his firm and KB and -- 02:58

MR. O'HARA: Counsel, that -- this sounds like -- 02:58

MR. NOON: -- and there's not a relationship with Travelers.

MR. O'HARA: It sounds like a speaking objection. I --

MR. NOON: It sounds like you just misstated his testimony, so you keep misstating his testimony -- 02:58

MR. O'HARA: No, I asked him a question.

MR. NOON: -- I'll keep clarifying.

MR. O'HARA: I asked him a question. Let me read it back. 02:59

BY MR. O'HARA:

Q If the tripartite relationship never formed, but there was some attorney-client relationship that did form, isn't it true that that attorney-client relationship had to be between your firm and Travelers only? 02:59

MR. NOON: Objection. Misstates the evidence. He never testified to any attorney-client relationship forming you've just come up with.

THE WITNESS: I don't -- in my mind -- 02:59

MR. WRIGHT: Also argumentative. 02:59

THE WITNESS: In my mind, uh, I've never been retained to represent Travelers and I would -- it would be my perception that there is no attorney-client relationship with Travelers. 02:59

BY MR. O'HARA:

Q But factually, you did work on a case and you billed Travelers and got paid by Travelers?

MR. NOON: Objection. Misstates his testimony, doesn't know if he's been paid yet. 02:59

THE WITNESS: And -- and with that sidebar, yes, we did bill Travelers, but that doesn't mean Travelers is my client.

BY MR. O'HARA:

Q Well, if KB's not your client -- do you agree that KB's not your client? 03:00

A I was retained to represent KB, but I agree that KB has not authorized that, yes.

Q So if KB's not your client because they didn't authorize you to represent them, then for whom are you performing the legal services? 03:00

MR. NOON: Asked and answered. Go ahead and answer it again as you did.

THE WITNESS: In my opinion, the services are being performed by KB. They're being paid for by an 03:00

insurer that has a duty to defend KB, uh, and beyond that, I don't know how else to answer the question. 03:00

BY MR. O'HARA:

Q After the -- the first time that KB refused to allow you to represent it after you were appointed by Travelers, and then you performed monitoring work and billed Travelers, did you disclose that relationship to KB on future appointments? 03:01

MR. NOON: Objection. Vague, ambiguous, unintelligible. 03:01

THE WITNESS: Yeah, I'm not sure I understood the disclosure that I had been retained by Travelers to represent KB?

BY MR. O'HARA:

Q Let -- let me break it down. 03:01

So at some point in time you were proposed or assigned by Travelers to defend KB, correct?

A Correct.

Q And KB would not let you represent it, correct?

A Correct. 03:02

Q But then you did some legal work to monitor that case; correct?

A Correct.

Q And you billed Travelers for that legal work, correct? 03:02

A Correct. 03:02
Q And then another assignment was made by Travelers to represent KB, correct?
A Yes.
Q When that second assignment was made after you had already performed legal services, monitoring services and billed Travelers, did you disclose to KB at the time of the second appointment the fact that you had done monitoring work and billed Travelers in the prior matter? 03:02
MR. NOON: Objection. May call for speculation. 03:02
THE WITNESS: Uh, I know on the matters that I worked on, I've never made such a disclosure.
BY MR. O'HARA: 03:02
Q Do you believe that such disclosure would be required as a conflict or potential conflict?
MR. NOON: Objection. Calls for expert testimony, calls for legal opinion.
THE WITNESS: Yeah, I don't know the answer to that. I -- 03:03
BY MR. O'HARA:
Q What I was getting -- what I'm getting at, it's not -- I'm not, uh -- strike that. Let me --
If the representation by your firm in a 03:03

monitoring role, where you're billing and getting paid 03:03
by Travelers, but not being allowed to represent KB
constitutes an attorney-client relationship between your
firm and KB -- your firm and Travelers, I'm sorry, does
that relationship require a disclosure in future cases 03:03
where you're assigned to defend KB?

MR. NOON: Objection. Misstates his testimony.
Already in this deposition if there's some kind of
attorney-client relationship between his firm and
Travelers, which is the premise of your question, it's 03:04
contrary to his testimony in this deposition. I'm not
gonna allow him to speculate on expert opinions like
that. You can ask your experts that.

MR. WRIGHT: Lacks foundation, argumentative,
calls for speculation. 03:04

MR. NOON: I'm instructing you not to answer
that.

BY MR. O'HARA:

Q Did you ever make any disclosures to KB of
actual or potential conflicts that your firm might have 03:04
had, based on its monitoring work in cases where KB
refused to allow you to represent it?

MR. NOON: Objection. Vague, overbroad. Go
ahead and answer.

THE WITNESS: No. 03:05



Advanced Depositions
www.advanceddepositions.com | 855-811-3376

REPORTER'S CERTIFICATE

I, CATHY A. WOOD, CSR No. 2825, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney of this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: July 25, 2014

______________________

CATHY A. WOOD
CSR No. 2825